## Case No. 2,381.

### CANFIELD v. REED et al.

[Oliver's Forms (Ed. 1842) 496.]

District Court, D. Massachusetts. June, 1832.[1]

SEAMAN—INJURY IN THE SHIP'S SERVICE—LIABILITY FOR EXPENSES OF CURE—LACHES.

[1. A seaman belonging to a whaling ship was injured in the home port so severely as not to permit of his removal for a considerable time to the marine hospital, even though he had a right to be admitted there. No measures were taken to place him in such asylum. *Held*, that the ship owners were liable to reimburse him for expenses of cure, and of board, nursing, and attendance.]

[See note to Case No. 1,992.]

[2. The omission of such seaman to make any claim for more than a year after the close of the voyage does not affect his right to reimbursement.]

[In admiralty. Libel by William Canfield against Sheffield Reed and others, owners of the ship Albion, for compensation and reimbursement for injuries sustained by the libelant, in consequence of exposure, while in the discharge of his duty as a seaman.]

Andrew Dunlap, for libelant.

DAVIS, District Judge. This libel is for the recovery of compensation or reimbursement of expenses for board, medicine, surgical aid, attendance, and nursing, incurred by the libelant in consequence, as he alleges, of his having been severely frozen in his feet, whilst he was in the service of the ship Albion, owned by the respondents, of which ship Sheffield Reed, one of the respondents, was master. The ship Albion, returning from a whaling voyage, anchored nearly opposite the light-house on Clarke's point, New Bedford, in the afternoon of February 17th, 1831. Captain Reed landed at Fairhaven, and gave permission for one of the mates also to go on shore. On the return of the boat which conveyed Captain Reed on shore, and when that permission was

communicated, both the first and second mates, Severance and Hatch, expressed a wish to avail themselves of it. They finally concluded to go together, taking care to select a boat's crew for their conveyance, in whom they could assuredly confide that would return on board the ship that night, and in proper season. Winslow, a boat-steerer, Lyman, Nash, Spooner, and the libelant, took those officers on shore. They landed at New Bedford between seven and eight o'clock on that evening, and the boat's crew, excepting Spooner, who absented himself after visiting and taking supper at the house of one of Winslow's friends, left that house at nine o'clock, and immediately afterwards proceeded in the boat towards the ship. Soon after their departure from the wharf, there was a change of wind and weather; the cold became intense; they were surrounded and greatly impeded by cakes of drifting ice, and could not reach the ship, but, after unavailing efforts for that purpose, were driven out into the bay; remained in the bay, inclosed in ice, and, suffering extremely from cold, until between eleven and twelve o'clock at night of the following day, (the 18th of February,) when they were relieved by persons from the shore, and conveyed to New Bedford. Canfield, the libelant, was the greatest sufferer among these deserving individuals. His feet were so badly frozen as to render amputation of his toes necessary, and he was confined in a painful and crippled state, for relief and cure, at lodgings in New Bedford, for a long period,—a year or more,—and remained an unfortunate, and, in a great degree, helpless, cripple, having also incurred heavy expenses for board, nursing, and surgical aid.

This demand made on the owners, is repelled on various grounds. It is said that the service in which Canfield and his associates were engaged was a voluntary one, and not necessary for the service of the ship, or which they were required or compelled to perform; that the libelant and his companions disobeyed the injunctions of the mate, respecting the time allowed to them to remain on shore, and that they delayed their return unreasonably, feasting and drinking on shore, to a late hour, ten o'clock, before they attempted to go on board the ship; that the libelant was forthwith duly discharged, with the rest of the crew, and received his share of earnings in the voyage, according to agreement, without any claim or demand on his part or behalf for damages or compensation on account of the premises, and that he has not since made any such demand, until the commencement of the present suit; that the ship was furnished with a medicine chest, conformably to law, and that the libelant might have obtained relief and cure, so far as his case was curable, in the United States Marine Hospital, to which, it is said, he had a right to claim admittance.

---

[1] [Affirmed in Reed v. Canfield, Case No. 11,641.]

In regard to that portion of the defence which imputes the misfortune to culpable delay or disobedience on the part of the libelant and those who accompanied him, I cannot think it is sustained by the evidence. It was reasonable, and doubtless was considered so by the mate, that they should have some brief opportunity to refresh themselves before their return to the ship, and I do not find that the license given to them was abused. They did not spend their time "in feasting and drinking to a late hour," as the answer alleges, but merely partook of a moderate supper, at an early hour, offered at the house of a friend, and left the house at nine o'clock, laudably intent upon the performance of their duty to go on board the ship, and without any incapacity, as appears to me, from any improper indulgence, to perform all that their duty required. Nor can I think, that the ready engagement of the libelant and his companions to perform the service of bringing the two mates on shore, and to return that night, can have any just bearing or operation towards defeating or diminishing a claim to compensation, in consequence of an incidental misfortune, if otherwise well supported.

This is a calamitous case. Happily, there is seldom occasion to inquire into and apply the principle of maritime law, in reference to such casualties. The general and familiar doctrine, that a seaman, falling sick or wounded in the service of the ship, is to be relieved or cured at the expense of the ship, is indeed of frequent and familiar application in such instances occurring aboard, and expenses accruing from such cause are paid and sustained by the owners, excepting so far as they may be diminished by the ship being furnished with a medicine chest. It is argued that an obligation of this sort is only applicable to casualties occurring aboard; but I do not find sufficient ground for such limitation. "If the seaman," says Cleirac, "in the performance of his duty, and while rendering service to the master and to the ship, be wounded, and receive hurt or damage, he is to be cured, furnished with medicine, fed, and fully indemnified, at the expense of the ship." Us et Costumes de la Mer. 31. This passage is part of the learned author's comment on the 7th article of the Laws of Oleron, and, in the same connection, he quotes the 18th article of Wisbuy, 39th of the Hanse Towns, the 27th and 28th of the Ordinances of Charles II., and 16th of Philip IV. The ancient law, as we find it laid down by this venerable writer goes further in favor of the seaman than our usage. "If," says he, "the seaman be maimed in the defense of the ship against enemies or pirates, and be rendered incapable of labor for the rest of his life, he shall, besides his expenses, have a support so long as he may live, at the expense of the ship and her cargo. 'Il

aura du pain tant qu'il vivra." He reports a case, in which a French seaman, who had been made prisoner by the Turks, the vessel and cargo being released, recovered, in a suit against the owners, the amount paid for his ransom, with other incident expenditures. The judgment, which was rendered in a court at Bourdeaux, was affirmed by the court of appeal. Such extensive relief we have not found urged or required from owners of ships in modern times. If compensation is to be expended on such a scale, we expect it rather from the public, than from the individual shipowner; and it is contended that in this case the legal provision, by the establishment of marine hospitals, fully embraces the subject, and that the owners of our ships, such provision existing for sick or wounded seamen at home, are exonerated.

But I do not find when the libellant, belonging to a whaling ship, could be admitted to the marine hospital. The crews of vessels engaged in the fisheries are not required to pay hospital money, and are, by the existing regulations, precluded from the benefit of the marine hospitals in cases of hurt or illness accruing in fishing voyages, unless it should appear that the applicant, in some previous voyages of another description, had paid hospital money. If, however, the libellant were admissible to the hospital by law, and according to the rules of the establishment, his case was so severe as not to admit, for a considerable time, of his removal; and, if the owners of the ship be legally bound for the expenses of such cure, until the suffering seaman be placed in the hospital, it would seem incumbent on them to take measures for placing him in that asylum. It appears, indeed, that the legal rights and duties of the parties, respectively, in reference to this unhappy case, were not considered at the time when the offences commenced and before the settlement of the voyage. This presents difficulties in the case for which, perhaps, there is no complete remedy. An enforcement of the libellant's legal claims, at this time, against the owners, may subject them to the sole payment of a demand, which may have been properly chargeable to the whole concern.

The omission to make any claim of this description, until more than a year elapsed after the close of the voyage, was probably owing to the libelant's want of information of his legal rights, and, as was suggested in argument by his counsel, his claim for reimbursement of his necessary expenses, under his distressing circumstances, did not occur to his view until the publication of the case, recently decided in the United States district court in New York—Case of Robinson v. Gifford [Case No. 11,951a], inserted in the New Bedford Mercury of March 2nd, 1832. I regret the embarrassment which such a demand now occasions.

to the owners of the Albion, but, in obedience to the rules and principles of maritime law applicable to the case, I find myself bound to award to the libelant a reimbursement for the expenses of cure and of board, nursing, and attendance during the operation.

Amount awarded, $415.11 damages, and costs of suit. On an appeal to the circuit court, this decree was affirmed. [See Reed v. Canfield, Case No. 11,641.]

NOTE [from original report]. When a seaman is disabled by an accident in the actual discharge of his duty, it is a general rule that he is to be cured at the expense of the ship. Holmes v. Hutchinson [Case No. 6,639]. If a mariner, sent out to sea, or on shore, in the service of the ship, is taken and carried into slavery, he will be entitled to receive his whole wages. And, if the ship arrives safe, he will be entitled to an indemnity for his ransom money. Code de Commerce, liv. 2, tit. 5, art. 267, cited in Jacobsen's Sea Laws, 147. See, also, Rodman's Translation, 182. This indemnity he will be entitled to recover of the owners of the ship and cargo. But the law is laid down with some variation in the Encyclopedie Methodique (Jurisprudence) under the article Matelot: "Le matelot pris dans le navire, et fait esclave, ne peut rien prétendre contre le maître, les propriétaires, ni les marchands pour le paiement de son rachat. Mais il en est autrement, lorsque, ayant été envoyé en mer ou à terre pour le service du navire, il vient à être fait esclave; il est alors fondé à prétendre le paiement de sa rançon; savoir, sur le navire seul, s'il n'avait été commandé que pour le service du vaisseau simplement; ou, sur le navire et la cargaison, si le service avait eu l'un et l'autre pour objet il faut néanmoins, pour que la prétention du matelot soit autorisée, que le navire arrive à bon port; au surplus, le paiement de la rançon n'est pas dû indéfiniment au matelot, ce n'est que jusqu'à concurrence de 300 livres; mais il gagne outre cela ses loyers entiers, comme s'il avait servi tout le voyage," etc.

Where seamen contract for a lawful voyage, but are made the victims of an illicit voyage, for which they never intended to contract, and in which they have no voluntary participation, and the ship and cargo is seized, and they are imprisoned, they will be entitled to full wages from the time of their shipping and on the voyage to the time of their return to the United States, deducting their advanced wages, and whatever they may have earned (if any) in any intermediate employment. Shepard v. Taylor, 5 Pet. [30 U. S.] 675. Where a ship is captured, and the crew are forcibly put on shore by the captors, and the vessel is afterwards ransomed, but the seamen have no opportunity of rejoining her, they will be entitled to full wages, subject to a contribution to the ransom money. Girard v. Ware [Case No. 5,460].